# United States Court of Appeals
## For the First Circuit

No. 13-2467

CONNOR B., by his next friend Rochelle Vigurs; ADAM S., by his
next friend Denise Sullivan; CAMILA R., by her next friend Bryan
Clauson; ANDRE S., by his next friend Julia Pearson; SETH T., by
his next friend Susan Kramer; and RAKEEM D., by his next friend
Bryan Clauson, for themselves and those similarly situated,

Plaintiffs, Appellants,

v.

DEVAL L. PATRICK, in his capacity as Governor of the Commonwealth
of Massachusetts; JOHN POLANOWICZ, in his capacity as Secretary
of the Massachusetts Executive Office of Health and Human
Services; and ERIN DEVENEY, in her capacity as Interim
Commissioner of the Massachusetts Department of Children and
Families,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Kayatta, Circuit Judges.

Sara M. Bartosz, with whom Marcia Robinson Lowry, Rachel B.
Nili, Sarah T. Russo, Children's Rights, Mary K. Ryan, Daniel J.
Gleason, Jonathan D. Persky, and Nutter McClennen & Fish, LLP were
on brief, for appellants.
Liza J. Tran, Assistant Attorney General, with whom Martha
Coakley, Attorney General of Massachusetts, was on brief, for
appellees.
Andrew C. Glass, Stacey L. Gorman, and K&L Gates LLP, on brief
for Center for Public Representation, Juvenile Law Center,

<u>Massachusetts Juvenile Bar Association</u>, <u>National Center for Youth Law</u>, and <u>Youth Law Center</u>, as amici curiae in support of plaintiffs-appellants.

_____

December 15, 2014

_____

LYNCH, **Chief Judge**.  There is a common understanding in this case, shared by both the Commonwealth of Massachusetts and the plaintiffs, that the Massachusetts Department of Children and Families' (DCF) administration of the foster care system has flaws and is in need of improvement.  In some instances, these flaws have led to horrific and heartbreaking outcomes for children.

Plaintiffs, admirably concerned about foster children, seek to have a federal court both order and oversee improvements. "A federal court, of course, must identify a constitutional predicate for the imposition of any affirmative duty on a State." Youngberg v. Romeo, 457 U.S. 307, 319 n.25 (1982).  The plaintiffs have articulated convincing moral arguments that Massachusetts should do better. But they have not established, based on the facts, that there have been constitutional violations as to the class of foster children, so they are not entitled to an injunction or federal court oversight.  Improvements in the system must come through the normal state political processes.  The problems are now for the Governor and legislature of Massachusetts to resolve.

Six children brought this class action in federal district court on behalf of about 8,500 children who are or will be committed to Massachusetts foster care custody as a result of their having suffered from abuse or neglect.  These six plaintiffs did not seek individual relief, but relief on behalf of the class. They asserted that DCF so exposes the plaintiff class to harm or

-3-

the risk of harm that it violates various Amendments to the United States Constitution, as well as the Adoption Assistance and Child Welfare Act of 1980 (AACWA), 42 U.S.C. §§ 670 et seq.

After the plaintiffs fully presented their evidence at trial, and after the defendants examined two further witnesses but before they put on their whole case, the district court granted judgment on the record, under Fed. R. Civ. P. 52(c), for the defendants on all claims. Connor B. ex rel. Vigurs v. Patrick, 985 F. Supp. 2d 129, 138 n.10, 166 (D. Mass. 2013). The district court's careful factual findings are supported by the record, and the district court's legal conclusions contain no errors of law. We affirm the district court's decision.

I.

A. Litigation

Suit[1] was filed on April 15, 2010, against the Governor of Massachusetts, the Secretary of the Executive Office of Health and Human Services, and the Commissioner of DCF, in their official capacities. The defendants are alleged to have administered the foster care system in violation of the substantive and procedural

---

[1] The plaintiffs are represented by Children's Rights, a nonprofit advocacy organization that has brought other similar cases, among others. See Connor B., 985 F. Supp. 2d at 133 n.2; see also, e.g., DG ex rel. Stricklin v. Devaughn, 594 F.3d 1188 (10th Cir. 2010) (affirming class certification in suit against Oklahoma's foster care system); Cassie M. ex rel. Irons v. Chafee, 16 F. Supp. 3d 33 (D.R.I. 2014) (granting judgment for defendants on the record in suit against Rhode Island's foster care system).

components of the Due Process Clause of the Fourteenth Amendment, the constitutional right to familial association, and two rights arising from the AACWA, all resulting in harm to foster children while in DCF's care. Connor B., 985 F. Supp. 2d at 133 (summarizing allegations). The plaintiffs' complaint sought a broad injunction preventing the defendants "from subjecting Plaintiff Children to practices that violate their rights." They also sought highly specific injunctive orders which are set forth in Appendix A. These proposed orders contain subcategories, including orders governing caseload limits, comprehensive training programs, assessments of additional services for each child, monitoring, visitation rights, case plans, quality assurance systems, performance-based contract monitoring, maintenance rates, and appointment of expert monitors. In some of these areas, the plaintiffs sought adoption of standards from private organizations such as the Council on Accreditation and the Child Welfare League of America. Plaintiffs also sought their attorneys' fees, as well as costs and expenses.[2]

The district court soon certified the desired class on February 28, 2011. Connor B. ex rel. Vigurs v. Patrick, 272 F.R.D. 288, 291 (D. Mass. 2011). The class consists of "all children who

---

[2] See generally, e.g., Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542 (2010) (discussing the calculation of attorneys' fees after a consent decree in a class action by foster care children against Georgia).

-5-

have been (or will be) placed in the custody of [DCF] as a result of a state juvenile court order adjudicating them in need of 'care and protection' due to abuse or neglect by their parents," an estimated 8,500 children.  Id. at 291-92. The district court adopted an August 15, 2012, fact cutoff date for the liability determination.  Connor B., 985 F. Supp. 2d  at 133 n.1.  The defendants have not appealed the class certification order, so whether this class was appropriately certified is not before us.[3]

After extensive discovery, trial began on January 22, 2013.  Id. at 134.  At the close of plaintiffs' case, on April 30, the defendants filed a motion for judgment on the record pursuant to Fed R. Civ. P. 52(c).  Id.

The district court granted the defendants' motion on September 30 and issued an opinion on November 22.  See id. at 166. It made a lengthy series of factual findings cataloging areas where DCF needs to improve.  See id. at 138-56.  As the district court noted, because it did not hear the defendants' complete case, its findings may have overstated matters in favor of the plaintiffs. See id. at 138 n.10.  It ultimately concluded that, though "DCF's

---

[3] On August 20, 2010, the defendants moved to dismiss, challenging both the district court's jurisdiction and the sufficiency of the plaintiffs' complaint.  See Connor B. ex rel. Vigurs v. Patrick, 771 F. Supp. 2d 142, 151 (D. Mass. 2011).  The district court denied the defendants' motions on January 4, 2011. Id. at 172.  On December 3, 2012, the defendants also moved for partial summary judgment, which the district court denied as a matter of judicial economy.  Connor B., 985 F. Supp. 2d at 134.

management of foster care has been less than stellar," the facts did not demonstrate class-wide constitutional violations, nor a violation of the AACWA, and so injunctive relief was not warranted. Id. at 162-66. This appeal followed.

B. Findings

We first recount undisputed background material and findings to set the context. The history of both abused children and efforts to improve the care of children in Massachusetts foster care custody precedes the April 2010 filing of suit. In 2006, in reaction to several high-profile failures by DCF, the Massachusetts state legislature established a committee to study the state's child welfare system. That committee issued a report entitled "First, Do No Harm," which led to the enactment in July 2008 of state legislation reforming DCF's approach to children in its care. See 2008 Mass. Acts ch. 176.

In June 2007, also before this litigation was brought, a new Commissioner, Anthony "Angelo" McClain, arrived at DCF with a mandate to modernize and transform the department. In May 2008, he began development of a new strategic plan, involving a range of ideas for improvement from public and private sources. The goal was to adopt a subset of those ideas, those that were consonant with the state's context and complementary to DCF's existing programs. This planning process led to over 500 recommendations, which the Commissioner prioritized and addressed. DCF then adopted

-7-

some of those recommendations in the 2009 strategic plan and initiated demonstrable efforts to implement them. For example, DCF has made use of caseworkers more efficient and less abrasive for families. It reduced the number of caseworkers that dealt with families at the initial screening, from three caseworkers to two, and reassigned the third caseworker's responsibilities to the other two. This meant families could reduce the number of DCF workers with whom they interacted and briefed on their situation. DCF also extended the time allotted for initial screenings, so those screenings could be more thorough and involve input from a broader variety of people. The goal of this process, as the Commissioner explained at trial, was to institute "continuous efforts to get better . . . each month, each quarter." This effort preceeded filing of this suit.

Most of the severe abuses the six named plaintiffs experienced while in DCF custody were before or during 2009. Several of the six named plaintiffs suffered instances of rape, sexual abuse, beatings, force-feeding, and maltreatment. For example, Connor B. at age six was placed in a home with a teenager known to be at risk for sexually abusing younger children and was repeatedly raped. Connor B., 985 F. Supp. 2d at 141. The teenager was removed and DCF revoked the license of the facility. Id. The district court provided a fuller description of these abuses. Id.;

see also Connor B., 272 F.R.D. at 291-92 (recounting the allegations of each named plaintiff from the complaint).

DCF has continued its modernization efforts since the filing of this lawsuit. For example, DCF is updating its assessment protocols for its delivery of services to focus on the child's current well-being and to yield "practical actionable information," drawing from two national clinical approaches.

It is also true that DCF took over $100 million in budget cuts over the five years following the 2008 recession. Nonetheless, after suit was brought, DCF developed a second strategic plan, for 2012-15, seeking to build on the first set of process and structural improvements and to improve the content of care.

DCF's strategic plan has also led to progress and improvements for children in DCF's care. For the years since 1997 for which federal data is available, over 98% of children in the foster care system did not suffer from any abuse or neglect. Connor B., 985 F.3d at 139-40. Of the one-to-two percent who did suffer one incident of abuse, it has become more unlikely they will suffer a second instance. In 2009, about 88% of that small percentage of children who did suffer an incident of abuse or neglect made no second supported allegation of abuse or neglect within the next year. By 2011, 92% of that one-to-two percent who had been abused once in custody did not suffer further abuse.

DCF's strategic plan identified as a problem that it lagged behind other states in its rate of placing children with family ("kinship placement"). At trial, the Commissioner admitted falling short of the state statutory standard for kinship placement.[4] The reason was, in part, because the children's family members often encountered challenges in the background check process, for example due to a past criminal conviction. In response, as part of what DCF has called the "Kin First" initiative, DCF made it easier for family members to get background check waivers, which helped increase the number of children in kinship placements from 20% to between 27% and 28% over the course of the 2009 strategic plan. The number of children in family settings who are also in kinship placements increased to between 55% and 60% over the same time. That progress has been noted. Massachusetts officials, including the Secretary of the Executive Office of Health and Human Services, recognized DCF for its self-

---

[4] By statute and regulation, Massachusetts expresses a preference for placement of children with their kin when doing so is in the best interests of the child. See Mass. Gen. Laws ch. 119, § 23(c) ("Whenever the department places a child in foster care, the department shall immediately commence a search to locate any relative of the child or other adult person who has played a significant positive role in that child's life in order to determine whether the child may appropriately be placed with that relative or person if, in the judgment of the department, that placement would be in the best interest of the child." (emphasis added)); 110 Mass. Code. Regs. § 7.101(2) (2014) ("The Department shall consider, consistent with the best interests of the child, the following placement resources in the following order: (a) placement with a kinship family . . . ." (emphasis added)).

directed improvement efforts in 2012 and 2013, and the federal government selected DCF to participate with a handful of other states in a pilot program and awarded DCF a grant to train its stakeholders on trauma-informed practices.

Turning to additional findings from the district court's opinion, which we do not repeat in full, they reach a wide swath of DCF's activities.[5] For example, the court found that children in DCF custody[6] receive "relatively rare" visits from their family. Id. at 142-43. "DCF regularly makes use of a variety of short-term

_____

[5] The plaintiffs offered evidence from studies conducted by the Children's Research Center, expert testimony, testimony of DCF officials, federal reporting, and standards established by national child welfare organizations. See Connor B., 985 F. Supp. 2d at 136-40 & n.10.

[6] A child might enter DCF custody by means of three different procedures, as relevant here, going through the state court system. First, the normal procedure to commit a child to custody requires notice, an independent investigation, a hearing, and a judicial determination that the parent is unfit by clear and convincing evidence. See Mass. Gen. Laws ch. 119, §§ 24-26; Adoption of Carlos, 596 N.E.2d 1383, 1388-90 (Mass. 1992). Second, the emergency procedure allows transfer of a child to 72-hour custody if "the court is satisfied after [someone] testifies under oath that there is reasonable cause to believe that: (i) the child is suffering from serious abuse or neglect or is in immediate danger of serious abuse or neglect; and (ii) that immediate removal of the child is necessary to protect the child. . . ." Mass. Gen. Laws ch. 119, § 24. Finally, the procedure for temporary custody pending the statutory hearing requires that a court first certify that "continuation of the child in [the child's] home is contrary to [the child's] best interests and" DCF attempted to "prevent or eliminate the need for removal from the home." Id. §§ 25, 29C. At all these proceedings, the child and the parent have the right to counsel. Id. § 29. See generally Kindregan, Jr. et al., 3 Mass. Prac., Fam. Law & Prac. § 87.1 (4th ed.) (summarizing these procedures).

placements," which "disrupt the lives of children in care." Id. at 143. Only "between 43% and 50% of children received monthly visits from [] caseworkers," and the court acknowledged that there is "a correlation [] between the frequency of caseworker visits and favorable foster care outcomes." Id. at 146. Fewer than 20% of children receive a timely medical screening on entry into foster care. Id. at 148. Up to 35% of children lack an individualized case plan for their time in foster care, and many of the remainder have incomplete case plans. Id. at 155.

The court also found that these shortfalls are far from the whole story. Most notably, DCF has consistently and successfully protected about 99% of children in its care from maltreatment. Id. at 140 (citing data from 2006 to 2011). Though DCF lags behind other states and national metrics in (a) the number of children who suffer from maltreatment in foster care, (b) the rate of children who reenter foster care after leaving it, and (c) caseworker caseloads, DCF has improved in each of these categories. See id. at 140, 145-46, 151-52. Similarly, though DCF has been subject to federally mandated improvement plans under the Social Security Act and its regulations, see 45 C.F.R. § 1355.35, each time the state has satisfied those plans.

II.

We review the district court's findings of fact for clear error, and the governing legal issues de novo.[7] <u>Powell</u> v. <u>Alexander</u>, 391 F.3d 1, 7 (1st Cir. 2004). "An inquiry into whether current [institutional] conditions constitute an ongoing violation of a federal right comprises a mixed question of fact and law, the answer to which we review along a degree-of-deference continuum, ranging from plenary review for law-dominated questions to clear-error review for fact-dominated questions." <u>Healey</u> v. <u>Spencer</u>, 765 F.3d 65, 73-74 (1st Cir. 2014) (quoting <u>Morales Feliciano</u> v. <u>Rullán</u>, 378 F.3d 42, 52-53 (1st Cir. 2004)) (internal quotation marks omitted). Accordingly, we review "the legal labels applied to facts" more closely than we traditionally review factual findings, though "often with some deference to the district judge." <u>Battista</u> v. <u>Clarke</u>, 645 F.3d 449, 454 (1st Cir. 2011). The plaintiffs do not generally dispute the district court's factual findings. Their real dispute is with the legal conclusions that should be drawn from those findings.

---

[7] Judgment on the record is appropriate when "a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue." Fed. R. Civ. P. 52(c); <u>see</u> <u>Morales Feliciano</u> v. <u>Rullán</u>, 378 F.3d 42, 59 (1st Cir. 2004). "[T]he court's task is to weigh the evidence, resolve any conflicts in it, and decide for itself in which party's favor the preponderance of the evidence lies." 9C Miller et al., <u>Fed. Prac. & Proc. Civ.</u> § 2573.1 (3d ed. 2014). There was no Rule 52(c) error.

-13-

We choose to write narrowly. As Justice Souter has noted, courts should avoid, if possible, turning "fresh furrows in the 'treacherous field' of substantive due process." Troxel v. Granville, 530 U.S. 57, 76 (2000) (Souter, J., concurring in the judgment) (quoting Moore v. City of East Cleveland, 431 U.S. 494, 502 (1977) (opinion of Powell, J.)). The parties dispute the appropriate legal standard the plaintiff class has to meet to show a constitutional violation, specifically whether the plaintiffs must show that the defendants' treatment of children "shocks the conscience," see Cnty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998), or whether it suffices that they have met a different standard under Youngberg v. Romeo, 457 U.S. 307 (1982). We have no need to decide that legal question because the plaintiffs' evidence does not establish that even the Youngberg standard is met. Our conclusions are similarly narrow on the remaining claims.

### III.

#### A. Substantive Due Process Claim

The Due Process Clause imposes a duty on the state for the "safety and general well-being" of an individual when the state affirmatively "restrain[s] the individual's freedom to act on his own behalf -- through incarceration, institutionalization, or other similar restraint of personal liberty." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 200 (1989). Notably, this duty does not arise from "the [s]tate's knowledge of the

individual's predicament or from its expressions of intent to help" the individual.  Id.  The parties agree on this.

Whether the state deprived an individual of "freedom to act on his own behalf," and so is subject to a correlative constitutional duty, is often described as whether a "special relationship" exists between the state and the individual.  J.R. v. Gloria, 593 F.3d 73, 79 (1st Cir. 2010) (quoting Rivera v. Rhode Island, 402 F.3d 27, 34 (1st Cir. 2005)) (internal quotation marks omitted).  Though we have never held that such a relationship exists between the state and children in foster care, we have assumed so arguendo.  See Gloria, 593 F.3d at 80.  We do so again here.

The district court found that the special relationship of foster care entails a duty on the state to provide for six particular rights: (1) to a safe living environment, (2) to services necessary for the children's physical and psychological well-being, (3) to treatment and care consistent with the purpose of their entry into the foster case system, (4) to custody only for such time as is necessary, (5) to receipt of care and treatment through the exercise of accepted professional judgment, and (6) to the least restrictive placement.  Connor B., 985 F. Supp. 2d at 158-59.  We need not and do not resolve whether the Constitution offers such broad positive guarantees.  The defendants do not challenge the district court's holding, so we will also assume

-15-

arguendo that these six areas constitute an appropriate framework for analysis.

The Supreme Court has explained that executive branch actors violate an individual's constitutional rights only if they engage in conduct that "shocks the conscience." Lewis, 523 U.S. at 846; see Gloria, 593 F.3d at 79-80. In particular, Lewis makes clear that harm caused by officials' negligence categorically cannot be a Due Process violation. Lewis, 523 U.S. at 848-49.

Sixteen years before Lewis, in Youngberg, the Supreme Court found cognizable certain limited substantive due process claims by an adult involuntarily committed in a state institution for the intellectually disabled. In Youngberg, the plaintiff claimed due process rights to "safe conditions of confinement," "freedom from bodily restraints," and "training or 'habilitation.'" 457 U.S. at 309. The Court affirmed the first two as historic liberty interests. Id. at 315-16. As to the third, though the state had a duty to provide "certain services and care" to those involuntarily in its custody, the state also "necessarily has considerable discretion in determining the nature and scope of its responsibilities," including discretion in choosing among aspects of a problem to approach at a given time. Id. at 317. The Court found only that the state owed the plaintiff "minimally adequate or reasonable training to ensure" his other liberty interests, rather than finding an independent "general constitutional right to

training per se" or treatment that would enable the plaintiff to achieve his "maximum potential." Id. at 318-19 & n.23.

Even those established liberty interest rights were "not absolute." Id. at 320. The issue was "not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint or lack of absolute safety is such as to violate due process." Id. Importantly, the Court held that "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. at 323. This is what is referred to as the Youngberg standard.

Whatever tension there is between the Youngberg standard and the Lewis shocks-the-conscience test[8] is of no moment here. The district court found, on the facts, that neither standard was

---

[8] The plaintiffs urge that these cases, read together, show that the Youngberg standard is the definition of conscience-shocking conduct in the context of those involuntarily committed -- including both the plaintiff in Youngberg and the class here. Rejecting that argument, the district court adopted a "new, two-pronged approach," requiring the plaintiffs to prove both that the defendants' conduct violated the Youngberg standard "and that such conduct shocks the conscience." Connor B., 985 F. Supp. 2d at 160 (quoting Connor B., 771 F. Supp. 2d at 163) (internal quotation mark omitted). On appeal, the defendants vigorously defend the district court's rule.

met.  It suffices that we agree that the Youngberg standard was not met and do not go further.[9]

Youngberg also requires that courts presume that the decisions of qualified professionals -- like the administrators of DCF -- are valid.[10]  457 U.S. at 323.  Liability is appropriate only when the professionals' decision is "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person[s] responsible actually did not base the decision on such a judgment."  Id.  Such deference to state officials is appropriate to minimize undue "interference by the federal judiciary with the internal operations of [state] institutions," as "[i]t is not appropriate for the courts to

---

[9] Plaintiffs also argue that the district court improperly adopted a mens rea requirement for the Youngberg test by using the term "wanton."  Connor B., 985 F. Supp. 2d at 160 (construing the standard to require "the most wanton abandonment of caretaking responsibilities," rather than "mere deviance from professional norms").  We disagree.  Reading the opinion as a whole, the district court did not misapprehend the correct standard, though its choice of colorful language was unfortunate.  The court applied the correct Youngberg standard, focusing on objective measures of DCF's performance, not the state of mind of the actors.

[10] This is not a typical Youngberg case, in which the plaintiffs challenge a professional's particular decision or practice that applies to them, like the medical protocols in Youngberg itself.  See, e.g., Santana v. Collazo, 793 F.2d 41, 42 (1st Cir. 1986) (describing challenge to use of isolation at juvenile detention facility).  Nonetheless, administration of a foster care system is a matter of professional judgment, similarly involving specialized expertise and professional norms.  See, e.g., Connor B., 985 F. Supp. 2d at 136-38 (describing the credentials and expertise of individual professionals and institutions appearing at trial).

specify which of several professionally acceptable choices should have been made."  Id. at 321-22 (quoting Romeo v. Youngberg, 644 F.2d 147, 178 (3d Cir. 1980) (Seitz, C.J., concurring)) (internal quotation mark omitted).  As the Court explained in Lewis, "the Fourteenth Amendment is not a 'font of tort law to be superimposed upon whatever systems may already be administered by the States . . . .'"  523 U.S. at 848 (quoting Paul v. Davis, 424 U.S. 693, 701 (1976)).

We agree that the six individual plaintiff children were in fact harmed.  But the plaintiffs do not ask for a determination as to whether the constitutional rights of those six were violated. This lawsuit was not framed to bring relief to the named plaintiffs, but to obtain class-wide federal injunctive relief mandating federal court oversight of the enormously complex state foster care system.

The DCF, apart from being subject to federal constitutional obligations, has duties imposed by state statutes and regulations.  But violation of a state law duty is not a ground on which to award federal injunctive relief.  And there is no claim that there is a constitutional infirmity in any relevant state law.

The plaintiffs have sought to take aspirational statutory, regulatory, and private standards[11] as to a variety of

---

[11] The district court extensively discussed the regulatory structure and sources of child welfare standards in its opinion, and we refer the reader to that.  See Connor B., 985 F. Supp. 2d at

topics within the overall complex of foster child care and convert each of them to constitutional requirements. The district court correctly rejected that attempt, as do we.

This is not a case in which the plaintiffs have shown that the DCF has engaged in particular practices which have already caused direct harm to the entire class or even a majority of the class. Nor have the plaintiffs shown that the Youngberg standard has been met on existing conditions. The assertion also fails that the present deficiencies mean that the children are exposed to an incrementally greater risk of future harm, and harm of constitutional dimensions. That there may be deficiencies yet to be fully addressed does not establish that there has been a constitutionally cognizable increased risk of class-wide harm, much less that the Youngberg standard has been satisfied.

There are good reasons class-wide challenges to a state agency's entire set of practices for care of foster children are difficult to bring successfully. As Youngberg states, "there certainly is no reason to think judges or juries are better

_____

136, 139-40, 142-51, 153-56. However, the federal standards were intentionally set above the performance of most states -- at the 75th percentile of states -- specifically to push states to improve against that benchmark. Id. at 139 n.13; see Title IV-E Foster Care Eligibility Reviews and Child and Family Services State Plan Reviews, 65 Fed. Reg. 4020, 4025 (Jan. 25, 2000) (codified at 45 C.F.R. pts. 1355-1357) ("We recognize that we have set a high standard. However, we think it is attainable and that our overall approach for moving States to the standard through continuous improvement is sound.").

-20-

qualified than appropriate professionals in" administering an institution. 457 U.S. at 322-23. Judicial review is "limit[ed]," to prevent "interference by the federal judiciary with the internal operations of these institutions." Id. at 322. The presumptive correctness of the decisions of professionals is "necessary to enable institutions of this type -- often, unfortunately, overcrowded and understaffed -- to continue to function." Id. at 324.

The plaintiff class has failed to show that the district court's findings of fact and ultimate conclusions are clearly erroneous. The bottom line of the findings is that in all but one year of the period 2006-11, more than 99% of children in DCF foster care custody were safe from abuse and neglect while in custody. Connor B., 985 F. Supp. 2d at 140.[12] Where DCF was not able to prevent maltreatment from occurring, the court found DCF "acted reasonably when such events took place by removing the foster child from the harmful environment." Id. at 161.

The fact that a child reenters foster care again after release from custody does not establish that there has been a constitutional violation -- in fact, the best interests of the child may require it. Even using that as a metric, reentry rates for children who have previously been in foster care have dropped

---

[12] And even in its worst year, Massachusetts missed the national standard set by the federal government by less than one percent. Connor B., 985 F. Supp. 2d at 139-40, 160-61.

from 22.3% in 2000-01 (compared to the national standard of 8.6%) to between 15% and 16% for years between 2006 and 2011 (close to the national medians fluctuating between 11.8% and 15%).  Id. at 145-46.  Indeed, DCF has improved on a variety of metrics in recent years, including kinship placements, caseworker caseloads, and prevention of repeat incidence of maltreatment.[13]

The district court noted that placement problems could be "traced to a single root cause:" the "severe shortage in the number of foster homes."  Id. at 144.  It also noted that increasing the number of foster homes would not necessarily itself resolve the ongoing placement difficulties.  Id. at 144-45 (explaining the need to recruit foster homes with particular characteristics, like the ability to handle certain types of behavior, to meet each child's individual needs).  As the defendants observed at oral argument, insofar as DCF has fallen short of federal requirements, it has also fully implemented the attendant federally imposed improvement plans.

The court did not accept the plaintiffs' assertions that DCF officials had unconstitutionally mismanaged the system, or that DCF officials engaged in substantial departures from professional

_____

[13] While the plaintiffs view DCF's conduct through the lens of their class, DCF exercises its professional judgment to improve the system as a whole, which encompasses children far beyond the class. DCF's efforts to improve its screening process before children enter foster care custody, as discussed above, buttress the defendants' case.

judgment, and that mismanagement had caused harm to the class.  It found the plaintiffs have not proven "institutional" failings as to the class.  Id. at 162.  We agree.  Having reviewed the voluminous record, the evidence simply does not show that DCF has substantially departed from accepted professional judgment, much less that it departed so substantially as to show that such judgment was not exercised.  See Youngberg, 480 U.S. at 323.  Plaintiffs also say the district court erred in not separately analyzing the "risk of harm" as it was required to do in an injunctive relief case.  Again, we do not agree that the court failed to conduct such an analysis.[14]

The district court observed that, though DCF has failed to comport with national standards and its internal policies, such data "do not reveal the entire picture."  Connor B., 985 F. Supp. 2d at 160.  DCF is actively improving, and the Due Process Clause does not require that the defendants instantly fix all deficiencies in the foster care system.

Plaintiffs emphasize that the defendants have allowed some deficiencies to persist as to some problems after identifying them.  DCF has admittedly corrected other problems, and plaintiffs do not suggest that the defendants have failed to exercise

---

[14] We do not accept the argument that being in the bottom of a list of states, without more, provides strong evidence of a constitutional violation.  Once a list is established, there is always someone at the bottom.

professional judgment in ordering improvements over time, or in deciding which deficiencies to address first. Instead, plaintiffs characterize these improvements as no more than "preliminary" and inadequate in light of the scope of the problem. A state is not required to "choose between attacking every aspect of a problem or not attacking the problem at all." Youngberg, 457 U.S. at 317 (quoting Dandridge v. Williams, 397 U.S. 471, 486-87 (1970)) (internal quotation marks omitted).

Not only has class-wide liability not been shown, itself a needed precursor to any relief, but plaintiffs have also not met the requirements for injunctive relief. See eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006) (describing the equitable requirements for injunctive relief). To grant injunctive relief notwithstanding DCF's concrete, good faith improvements is precisely the kind of substitution of judicial judgment for professional judgment that Youngberg prohibits, especially in light of the "sensitive federalism concerns" at play in institutional reform litigation. See Horne v. Flores, 557 U.S. 433, 448 (2009) (noting in a different context that "[f]ederalism concerns are heightened" when relief would "dictat[e] state or local budget priorities").

The plaintiffs offer a final argument that the court's several mentions of budgetary constraints on DCF constitutes legal error justifying automatic reversal. They cite Watson v. City of

-24-

Memphis, 373 U.S. 526 (1963), among other cases, for the proposition that "vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." Id. at 537.

More precisely, plaintiffs say the court committed legal error by "elevating fiscal considerations to a defense in a constitutional case where fundamental rights have been shown to be violated." We need not consider that legal proposition, because the premise is not true. That is not what Judge Young did.

The district court found there were no constitutional violations. It did not find that there were violations but that they were caused and so excused by budgetary constraints. It began its conclusions of law by explaining that its role is "to adjudicate the claims before it, [] external considerations notwithstanding." Connor B., 985 F. Supp. 2d at 158. It explicitly cited the same sentence from Watson v. City of Memphis that the plaintiffs quoted above. Id. In the substantive due process section, its discussion of "financial and administrative constraints" comes after its conclusion, based on the record, that "it is not clear that the Defendants' behavior has sunk to a level warranting injunctive relief." Id. at 160-61. Finally, the district court decided that, in light of the "mixed record," including DCF's improvements in certain areas, it "respectfully declines to substitute its judgment for that of duly elected

-25-

Massachusetts lawmakers." Id. at 162. In the portion of the opinion dealing with payments to homes that take in foster children, the district court expressly discussed its willingness to find the defendants liable should they "fall substantially below . . . guidelines in the coming months or years," notwithstanding budgetary pressures. Id. at 165-66. The court committed no error.[15]

B. Other Claims

The plaintiffs' three other legal claims fail for similar reasons.

1. Familial Association

The plaintiffs claim that the defendants' conduct violated their independent constitutional right to familial association. "[T]he Supreme Court has recognized an abstract fundamental liberty interest in 'family integrity' . . . ." Watterson v. Page, 987 F.2d 1, 8 (1st Cir. 1993) (citing Frazier v. Bailey, 957 F.2d 920, 292-30 (1st Cir. 1992) (collecting cases)). That interest typically arises in cases concerning parents' rights

---

[15] The plaintiffs are wrong to suggest that a state's fiscal constraints are irrelevant. In Youngberg itself, the Court explained that the decisions of professionals are presumptively valid in part because such a presumption is "necessary to enable institutions of this type -- often, unfortunately, overcrowded and understaffed -- to continue to function." 457 U.S. at 324. Youngberg also noted that in Parham v. J.R., 442 U.S. 584, 599-600 (1979), a procedural due process case, the balancing of an individual's liberty interests against those of the state includes "the fiscal and administrative burdens [which] additional procedures would entail." Youngberg, 457 U.S. at 321.

to decide "the care, custody, and control of their children." E.g., Troxel, 530 U.S. at 66 (2000) (plurality opinion); Hatch v. Dep't for Children, Youth, & Their Families, 274 F.3d 12, 20 (1st Cir. 2001). That parental interest is not the direct issue here, as the state courts have granted custody here to DCF, not the parents. This is not a case in which we are asked to assess a parent's challenge to the state's removal of a child from the parent's custody. Rather, the challenge here is to the adequacy of the state's efforts to maintain family contacts after it has properly removed a child.

It is also true that the Supreme Court and this court have used language expressing an interest in familial integrity, privacy, and association in broader terms than that of parents having control of their children. See, e.g., M.L.B. v. S.L.J., 519 U.S. 102, 119 (1996) (explaining that "the interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment" (quoting Santosky v. Kramer, 455 U.S. 745, 774 (1982) (Rehnquist, J., dissenting) (internal quotation marks omitted))); Stanley v. Illinois, 405 U.S. 645, 651 (1972) ("The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment . . . ." (citations omitted)); Parker v. Hurley, 514 F.3d 87, 102 (1st Cir. 2008) (citing M.L.B., 519 U.S. at 116) ("The due process right of

parental autonomy might be considered a subset of a broader substantive due process right of familial privacy."); Carter v. Lindgren, 502 F.3d 26, 30 (1st Cir. 2007) (discussing the "right to familial integrity" regarding parental custody).

The scope of this interest in familial integrity is far from clear. See Payne-Barahona v. Gonzáles, 474 F.3d 1, 3 (1st Cir. 2007) (noting that the family integrity cases "are notable for the division of views in most of the cases and for the difficulty of fitting the analyses or results into a coherent pattern"). It is clear that the interest is a limited one. In particular, it is balanced against the state's right to investigate allegations of abuse or neglect and take appropriate remedial action. See Carter, 502 F.3d at 30; Hatch, 274 F.3d at 20-22.

The district court found that this family integrity "right" is only "implicated when children [in custody] are denied any meaningful contact with family members." Connor B., 771 F. Supp. 2d at 164 (rejecting the "any contact" standard as too stringent); accord Connor B., 985 F. Supp. 2d at 163. The district court also viewed this interest "through the lens of substantive due process, as the former is derived in whole or in part from the latter." Connor B., 985 F. Supp. 2d at 163. The plaintiffs challenge neither of these characterizations, so we accept them arguendo. Indeed, it is not clear that this argument adds anything to the substantive due process claim.

-28-

The plaintiffs' principal argument on appeal is that the district court denied relief on this right to meaningful family contact for children in DCF care solely due to DCF's budgetary constraints. Not so. Viewing this right through the lens of substantive due process, at issue is DCF's application of professional judgment in administering the relationship between the children in its custody and their families.

The plaintiffs argue that DCF has a affirmative constitutional duty to facilitate parental and sibling visitation. Even if so, the district court found Massachusetts was in substantial conformity with federal statutory law under the Social Security Act based on the first round of federal assessments. Id. at 142, 163-64. That compliance with the statute undercuts any claim of a constitutional violation during this time period.

The plaintiffs then focus on the fact that Massachusetts was found in need of improvement by the Children's Bureau of the Department of Health and Human Services in its second round of assessments, completed in 2007. Id. at 142, 163-64. Similarly, the district court extrapolated from the plaintiffs' study of DCF case files from 2009-10 to find that only 20.9% of children received consistent monthly visits from siblings, and 37.6% from parents. Id. at 142-43, 163-64. But DCF represents that it has complied with the improvement plan derived from that federal review, and the plaintiffs do not suggest otherwise.

Indeed, it would be irresponsible of DCF to provide family access in certain situations. By definition, the class members are those children who have been removed from their families because a state juvenile court has reviewed testimony and determined that they suffered abuse or neglect at their parents' hands or those of the relevant supervisory adult. Connor B., 272 F.R.D. at 291; Connor B., 771 F. Supp. 2d at 150. The plaintiffs do not quantify the number of children for whom family visits are appropriate but unprovided.

DCF's approach to familial integrity is also much broader than the visitation interest pressed by the plaintiffs. DCF has made efforts to improve its initial screening protocols with the aim of improving DCF's working relationship with those families. Similarly, while the district court recognized that DCF failed to place children with siblings or near families in about a third of cases, children with siblings in foster care are often placed with at least one sibling for at least part of their time. Connor B., 985 F. Supp. 2d at 142-43.

Kinship placements, as described earlier, are a present and ongoing locus of DCF improvements. To the extent that children are not placed with their kin, it is in part because not all children have kin with whom they could properly be placed, particularly in light of the other factors (like those related to child safety) which bear on the placement decision. See Connor B.,

-30-

985 F. Supp. 2d at 142 (citing 110 Mass. Code Regs. §§ 7.108, 7.113) (explaining considerations other than kinship that affect the placement choice).

The record does not show that the plaintiff class is denied any meaningful contact with their family members on a class-wide basis, nor that any purported failure on the part of DCF to facilitate familial contact is a substantial departure from accepted professional judgment. To the contrary, it shows that DCF exercised professional judgment in administering its system with reference to familial association, and the federal government has found it adequate.

2.  Procedural Due Process

The plaintiffs also appeal the district court's denial of their federal procedural due process claim. The plaintiffs argue that there are four protected rights as to children in custody to which procedural due process must attach. Those rights are (1) rights in relation to "placement of children in private families; early and periodic screening, diagnostic and treatment standards; individualized health care plan," (2) the right to a medical passport, (3) rights to sibling visitation, and (4) the right to be considered for placement with relatives or similar persons. Connor B., 985 F. Supp. 2d at 164. We will assume arguendo that these rights may ground a constitutional claim.

The plaintiffs' claim is that advance written notice of DCF's intent to "deny, reduce, or terminate services" -- which is required by the state regulations governing DCF, 110 Mass. Code Regs. § 8.01(1) -- is "not uniformly and consistently provided." Another state regulation also grants children in DCF custody the right to appeal, inter alia, "the suspension, reduction, or termination of a service." 110 Mass. Code Regs. § 10.06(3). Under the relevant state law, those hearings "shall be scheduled" within 90 days. Id. § 10.10(2) (2011); see id. § 10.10(1)(2014) (using a 65-day deadline). But DCF has not met those state law requirements. Fair hearings are subject to "overwhelming backlogs" such that they are rarely held within the regulatory time frame. Connor B., 985 F. Supp. 2d at 156, 164.

Even so, the plaintiffs' evidence does not suffice to establish a violation of any federal procedural due process right. The plaintiffs do not allege that DCF's policies regarding these rights are inadequate. When DCF deviates from those policies, it is a mistake. Such mistakes under state law do not constitute a violation of federal due process, especially in light of the state's fair hearings. See, e.g., San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá, 687 F.3d 465, 478-81 (1st Cir. 2012) (en banc).

Beyond that, the plaintiffs have not explained, as they must, why hearings within 90 days (or 65 days), rather than

-32-

hearings on a longer time frame, are constitutionally required to prevent erroneous deprivations of rights, nor why enforcement of the regulatory limit they suggest instead is an appropriate burden to impose on the state. See Mathews v. Eldridge, 424 U.S. 319, 335 (1976). Here, as in the substantive due process inquiry, we are mindful of the practical reality that imposing a series of constitutional procedural requirements on an "overcrowded and understaffed" institution consisting of individuals with "widely varying needs and problems" could prevent the institution from continuing to function. Youngberg, 457 U.S. at 324; see also id. at 321 (linking the substantive and procedural due process analyses' balance between individual interests and society's demands).

The plaintiffs respond by arguing that any delay in giving children the prophylactic protections described above can lead to irreparable harm, so the defendants should at a minimum be held to the regulatory time limit. That argument is again insufficient. The plaintiffs must explain why, in light of the Mathews balancing test, the DCF's current conduct notwithstanding the regulation is constitutionally inadequate. They have not done so.

3.  Federal Statutory AACWA Claim

Finally, the plaintiffs allege that the defendants failed to provide a substantial number of class members with full

individualized case plans, as required by the AACWA.[16]  The AACWA, part of the Social Security Act, is a grant of federal funding for expenses associated with operating a foster care system.  Connor B., 771 F. Supp. 2d at 168. In order to obtain the funding, the state must submit a plan for the operation of its foster care system and receive approval from the Secretary of Health and Human Services (HHS).  Suter v. Artist M., 503 U.S. 347, 351 (1992), superseded by statute on other grounds, 42 U.S.C. § 1320a-2.  One required component of such a plan is that states must develop a case plan "for each child receiving foster care maintenance payments."  Connor B., 985 F. Supp. 2d at 155 (quoting 42 U.S.C. § 671(a)(16)) (internal quotation mark omitted).  A case plan is a written document that must include the child's records and information about the plans for the child, such as the prospective placement, the services the child will receive, and the steps taken toward stability and eventual permanency.  42 U.S.C. § 675(1).  The district court held, and the defendants do not contest here, that the AACWA creates a privately enforceable right.  Connor B., 771 F. Supp. 2d at 168-172 (citing Lynch v. Dukakis, 719 F.2d 504, 510-11 (1st Cir. 1983)).[17]

---

[16] The plaintiffs do not appeal the district court's denial of their claim that the defendants failed to make adequate foster care maintenance payments under the AACWA.  See Connor B., 985 F. Supp. 2d at 165-66.

[17] The parties dispute whether DCF must strictly comply with the AACWA, or merely substantially comply with it.

The AACWA is also enforced by the Secretary of HHS, who is empowered to withhold federal funding if the state fails to comply substantially with the statutory requirements and fails to implement a corrective plan. Sam M. ex rel. Elliott v. Chafee, 800 F. Supp. 2d 363, 388 (D.R.I. 2011) (citing 42 U.S.C. § 1320a-2a). The Secretary has chosen not to take such action here. No one in this case wants the Secretary to cut off the roughly $60 million Massachusetts receives from HHS. See Administration for Children and Families, FY 2013 ACF Justification of Estimates for Appropriations Committee at 337 (identifying Massachusetts's actual foster care funding from FY 2011 at slightly above $60 million).

The district court denied the claim that the AACWA had been violated as to the class. That court cited evidence from the plaintiffs that the files for 14.6% of children sampled from a group entering foster care and 35.1% of children sampled from a group in foster care for two years or more lacked case plans. Connor B., 985 F. Supp. 2d at 155. Of those files that included case plans, many were incomplete. Id. at 155-56. From this evidence, the district court found that case plans "are generally not well maintained and, in some cases, are entirely unavailable for review." Id. at 166. It then concluded that these failures constituted mere "gaps in record keeping," not "grave statutory error," "particularly when viewed in the context of the financial and administrative hardships that have been discussed above." Id.

We understand the court to have drawn a distinction, in part, between whether services were adequately provided and whether the paperwork was done.

We agree with the district court that this record does not show a class-wide failure to provide documentation in the form of individualized case plans. The district court found that between about 65% and 85% of children have individualized case plans. Id. That case plans are "not well maintained and, in some cases, . . . entirely unavailable for review," id., is not enough to prove that DCF is out of compliance with the statute vis-à-vis the class.

IV.

Having carefully heard and analyzed the evidence, the district judge offered editorial comments about areas of DCF deficiency which, while not unconstitutional, nonetheless warrant attention from the legislative and executive branches.

We end where we started, directing these matters to the attention of the state legislature and the Governor. The decision of the district court is affirmed. No costs are awarded.

So ordered.

Portions of the injunctive relief requested in the complaint:

e.  Order appropriate remedial relief to ensure Defendants' future compliance with their legal obligations to Plaintiff Children, including, but not limited to, the following:

i. Caseloads.  DCF shall establish and implement limits on the caseloads of all case-carrying workers for children in DCF placements and private agency placements operating under contract with DCF.  These caseload limits shall be based on the standards for accreditation of public child welfare agencies set by the Council on Accreditation ("COA") and the professional standards set by the Child Welfare League of America ("CWLA").

ii. Education/Training.  DCF shall develop and implement educational qualifications and a mandatory comprehensive pre-service and in-service training program for caseworkers and supervisors based on standards for acceptable management of a child welfare system;

iii. Availability of Necessary Resources for the Placement of Children and Services for Children and

Parents. An assessment shall be conducted by qualified professionals to determine the need for additional services and placements, including the need for family preservation services, foster and adoptive placements (including placements for children with disabilities or other behavioral needs), wraparound services, reunification services, independent living services, and medical, dental, and mental health services, for children in foster care throughout the state; and the time period during which these placements and services will be developed. Defendants shall take the steps necessary to develop these services and placements according to the assessment and the time frames it provides;

iv. Monitoring the Safety of Children in Placement. DCF workers shall visit all children in placement and their foster parents as frequently as set forth in the standards set by the COA and the CWLA in order to ensure that the children are safe.

DCF shall also comply with the standards and processes required under Massachusetts law for the approval, screening, oversight and utilization of all placement types that house foster children;

v. <u>Child-Parent and Sibling Visitation.</u> DCF shall develop and implement policies providing for adequate visitation between parents and children of those parents removed into foster care and siblings one or more of whom has been removed into foster care; Defendants shall develop and implement policies, which adequately provide for siblings being placed together in foster care and in adoptive or guardianship settings where those permanency goals are achieved;

vi. <u>Case and Service Planning.</u> DCF shall take necessary action to provide adequate and timely case plans and case reviews for children and adequate and timely services plans for their parents.

vii. <u>Quality Assurance/Data.</u> DCF shall ensure that it has a quality assurance ("QA") system consistent with the standards of the COA and CWLA that is capable of measuring the quality of services provided to children in DCF custody;

viii. <u>Contract Monitoring and Performance-Based Monitoring.</u> DCF shall ensure that an adequately staffed and trained contract monitoring unit is created within

the state's central office for purposes of overseeing and managing the purchased services of the agency; DCF shall develop and implement a performance-based contracting scheme with its private foster care providers to ensure the protection of children;

ix. <u>Foster Care Maintenance Rates.</u> DCF shall determine and pay foster care reimbursement rates that fully meet the elements set forth in 42 U.S.C section 675(4)(A);

x. <u>Monitoring/Enforcement.</u> The provisions of the Court order entered pursuant to Fed. R. Civ. P. 65(d) shall be monitored by a neutral expert monitor appointed by the Court. In addition, the Court shall have continuing jurisdiction to oversee compliance with that order.