# United States Court of Appeals
## For the First Circuit

No. 09-1404

J.R., a minor, P.P.A. Molly Raymond; MOLLY RAYMOND; B.R.,
a minor, P.P.A. Molly Raymond,

Plaintiffs, Appellants,

v.

MARGARET GLORIA; STEPHANIE TERRY; STATE OF RHODE ISLAND
DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, District Judge]

Before

Lynch, Chief Judge,
Lipez and Howard, Circuit Judges.

Thomas L. Mirza and Pelletier & Mirza, LLP were on brief for
appellants.
Genevieve M. Allaire Johnson, Special Assistant Attorney
General, with whom Patrick C. Lynch, Attorney General, were on
brief for appellees.

January 27, 2010

**LYNCH, Chief Judge.** This is one of several cases before this court claiming that the state of Rhode Island has failed to protect children in its care.

Plaintiffs, a family whose twins were in foster care, here appeal from the district court's grant during trial of a Rule 50(a) motion for judgment as a matter of law to the defendants, Margaret Gloria, a social worker for the Rhode Island Department of Children, Youth, and Families (DCYF), and Stephanie Terry, her supervisor. See J.R. v. Gloria, 599 F. Supp. 2d 182, 205 (D.R.I. 2009).

Plaintiffs J. R. and B.R., twin boys and minors, and their mother, Molly Raymond, brought substantive due process claims under 42 U.S.C. § 1983 and state law claims under Rhode Island negligence law for damages against the two state DCYF officials. Plaintiffs allege that when the twins were living in foster care between November 1996 and May 1998, from the ages of four to five, they were physically and sexually abused by Samuel "Thinman" Stevens, who they say lived in the foster home and acted as the twins' de facto caretaker. They claim this abuse resulted from defendants' actionable failures to comply with state law requirements.

The question before us is whether the court erred in granting defendants immunity from the federal and state law claims at issue. We hold that the district court properly granted

defendants qualified immunity on the § 1983 action and judgment for defendants on state sovereign immunity and qualified immunity defenses under Rhode Island state law.  This case also demonstrates the adage that claims based on possible violations of state laws do not necessarily make out claims of violations of federal due process guarantees.

I.

Because this is an appeal from a grant of a Rule 50(a) motion, we recount the facts in the light most favorable to plaintiffs.  See Philip v. Cronin, 537 F.3d 26, 32 (1st Cir. 2008); see also Jennings v. Jones, 587 F.3d 430, 438 (1st Cir. 2009).

J.R. and B.R. were placed in a foster home in Providence, Rhode Island with Faith Sykes and her husband, Marron Smith, in November 1996, when they were four years old.  Neither defendant had a role in the placement decision.  There is no claim that the twins should not have been placed in foster care or that the initial placement in the Sykes home was inappropriate.  Rather, plaintiffs' case turns upon defendants' alleged failure to investigate and prevent the events that are alleged to have occurred during this placement.

Plaintiffs claim that from the time the twins were placed in the Sykes home in November 1996 until they were removed in May 1998, defendant Gloria and others in DCYF knew that two adult men, Samuel Stevens, whom the twins referred to as "Thinman," and

William Lovick, whom the twins called "Bobo," were living on the third floor of the Sykes residence.[1] There were also numerous indications that both men, at various points, were acting as the twins' de facto caretakers.[2] Indeed, Stevens was such a regular presence at the Sykes home that Mary Starnes, the assigned DCYF case aide, identified the home with reference to "Thinman" in her notes, and she reported numerous interactions with Stevens to defendant Gloria. Stevens also accompanied Gloria to some of the twins' counseling sessions. Defendant Terry was also aware that Stevens and Lovick were involved in the twins' lives.

DCYF apparently did not ever complete background investigations of either Stevens or Lovick, although DCYF's regulations required the agency to screen any adult resident or regular caretaker in a foster home. See R.I. Dep't of Youth, Children, and Families, State of Rhode Island Foster Care Regulations § II.C, Clearances and Record Checks (1998) [hereinafter "Foster Care Regulations"]. Plaintiffs say that Gloria also told Sykes that both Stevens and Lovick could remain in

---

[1] For the purposes of this opinion, we will refer to the men by their last names as "Stevens" and "Lovick." William Lovick is also referred to as "Lovikk" and "Lovett" in the records.

[2] Plaintiffs do not allege that Lovick was responsible for the abuse they say occurred in the Sykes home. Rather, they portray his ongoing presence in the home without any background investigation as evidence of DCYF's lax supervision of the twins' foster care environment.

the home and knew that Sykes depended upon them to help supervise the twins.

Additionally, neither Sykes nor defendants Gloria or Terry ever reported to DCYF's licensing division that these men were residing in the home or that they were acting as caretakers for the twins. DCYF regulations required foster parents to inform the department of any such changes in foster household composition. See Foster Care Regulations §§ V.2; V.Q. In August 1997, DCYF's licensing division nonetheless renewed Sykes's foster home license. Foster home licenses can be revoked if the foster parent fails to notify DCYF of changes in household composition or if the foster parent omits important facts about the foster environment. Id. § III.C.

There were various Child Abuse and Neglect Tracking System (CANTS) investigations of the twins' care during their eighteen-month stay in the Sykes home. Two of the reports mentioned Lovick but not Stevens. In March 1997, J.R. told DCYF case aide Starnes that "Bobo" (Lovick) had hit him, but the twins did not answer further questions, and after further investigation, DCYF deemed the report unfounded. In August 1997, a separate investigation mentioning Lovick was initiated when the twins' counselor noticed J.R. had scratch marks on his head and neck. DCYF determined this report was also unfounded after the twins said these injuries came from fighting with each other. DCYF also made

a formal finding that there was insufficient evidence to conclude that Lovick was improperly supervising the children.

There were also several other reported incidents between the spring and fall of 1997 in which the twins exhibited behavioral problems or physical injuries, including bruises. With the exception of the reports discussed above, none of these reports mentioned either Stevens or Lovick. DCYF determined that none of these reports supported a formal finding of likely abuse.

On May 27, 1998, one of the twins' teachers called the DCYF hotline because she had noticed bruises on their forearms. The twins told a DCYF investigator that the bruises were made when "Thinman" (Stevens) hit them with a belt and that he had done this before. This was the first report mentioning Stevens. The investigator took the twins to the hospital and documented their injuries. DCYF also discovered a belt in the Sykes home in the location the twins had described. DCYF permanently removed the twins from the Sykes home that same day. Following an investigation, DCYF determined that there was credible evidence of institutional neglect by Sykes and abuse by Stevens.

In March 1999, some ten months after the twins were removed, the twins' mother and a counselor jointly reported for the first time that B.R. and J.R. had said "Thinman" had sexually abused them. DCYF investigated but determined the report was inconsistent and unfounded. Still, we will assume, in plaintiffs'

favor, that the report was correct because the harm it alleges is the foundation of their suit. Since the twins left the Sykes foster home in 1998, they have suffered from a number of severe developmental challenges and have required ongoing institutional care.

Plaintiffs originally sued Gloria and Terry for state law negligence claims in Rhode Island state court in 2001, but they amended the complaint to allege constitutional violations under 42 U.S.C. § 1983 in 2008. Gloria and Terry removed the case to federal court on April 15, 2008. The case proceeded to a jury trial. On November 17, 2008, at the close of plaintiffs' case and after six days of trial during which nineteen witnesses for plaintiffs testified, defendants filed a Rule 50(a) motion for judgment as a matter of law. They asserted, among other grounds, a qualified immunity defense to the § 1983 claim and immunity to the state law negligence claims based on Rhode Island's state sovereign immunity and state qualified immunity law.

In a decision and order dated February 26, 2009, the district court entered judgment for the defendants. J.R., 599 F. Supp. 2d at 183. It held that Gloria and Terry were entitled to qualified immunity against the § 1983 claims because plaintiffs' evidence, taking all the inferences in their favor, had not established that there was a substantive due process violation or that such a right was clearly established at the time of the

alleged violation.  Id. at 192-204.  It further held that Gloria and Terry were immune from state tort liability for their official conduct because of Rhode Island's state sovereign immunity and that Gloria was entitled to state law qualified immunity from the individual negligence claim.  Id. at 204-05.

II.

We review de novo a grant of judgment under Rule 50(a). See Hatfield-Bermudez v. Aldanondo-Rivera, 496 F.3d 51, 59 (1st Cir. 2007).  We review the district court's underlying legal conclusions de novo and take the evidence in the light most favorable to the plaintiffs.  See id. at 61.

A.       Federal Constitutional Claims under § 1983

Officials are entitled to qualified immunity against claims of federal constitutional violations unless (1) "the facts that a plaintiff has alleged or shown make out a violation of a constitutional right" and (2) "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Pearson v. Callahan, 129 S. Ct. 808, 816 (2009) (internal citations omitted).

The district court held that plaintiffs' case failed on both grounds.  On appeal, plaintiffs challenge the district court's ruling that Gloria and Terry were entitled to qualified immunity because, inter alia, plaintiffs had not put forward evidence that

could establish the first prong, that there was a substantive due process violation.

Plaintiffs' substantive due process theory turns upon Gloria's and Terry's alleged failures to protect the twins from the risks present in their foster home. Plaintiffs argue that Gloria and Terry knew that the twins were regularly being cared for by two unknown, uninvestigated adult male residents, Samuel "Thinman" Stevens and William "Bobo" Lovick. They also say that the number of DCYF investigations before May 1998 should have alerted Gloria and Terry to the possibility of abuse in the home.

Plaintiffs further argue that defendants were "deliberately indifferent" to these apparent risks because they failed to conduct background checks on Stevens and Lovick, did not report these changes in household composition, and failed to maintain regular, direct contact with the twins, even though, plaintiffs say, DCYF regulations required these steps to be taken. Had defendants told DCYF's licensing unit about Stevens's and Lovick's unreported presence in the home, plaintiffs say DCYF would have revoked the foster license. Plaintiffs theorize that if the license had been revoked, the boys would have been removed and they would not have been harmed.

We reject plaintiffs' argument and affirm the district court's holding that Gloria and Terry were entitled to qualified immunity because plaintiffs failed to establish on the facts that

there was a substantive due process violation.  We need not address whether any such "right" would have been clearly established at the time of the alleged violation, Saucier v. Katz, 533 U.S. 194, 201 (2001), though we note that plaintiffs did not challenge the district court's holding on this issue.

A Due Process Clause claim requires that there be a deprivation of life, liberty, or property by the government.  Here, the deprivations alleged were by private parties.  "As a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause," unless the government is responsible for the deprivation.  DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 197, 199-200 (1989).  There is no claim that the state officials here actively directed or assisted private actors in causing harm.

We have, under some language in DeShaney, posited that in situations where a state creates a "special relationship" because of "the limitation which [the state] has imposed on [an individual's] freedom to act on his own behalf," its subsequent failure to protect an individual may amount to a substantive due process violation.  Rivera v. Rhode Island, 402 F.3d 27, 34 (1st Cir. 2005) (quoting DeShaney, 489 U.S. at 200).  That affirmative duty to protect does not arise from the state's knowledge of the

individual's predicament or from its expression of intent to help him, but instead from the limitation described.[3]

The mere creation of a special relationship, even if placing young children into foster care created such a relationship, is not enough to make out a due process claim for any harm that may follow. Even then, the claim against the defendants must also involve "conscience-shocking" conduct by state officials, see id. at 35-36, and "the official conduct 'most likely to rise to the conscience-shocking level' is the 'conduct intended to injure in some way unjustifiable by any government interest.'" Chavez v. Martinez, 538 U.S. 760, 775 (2003) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)). The Supreme Court has also repeatedly "expressed [its] reluctance to expand the doctrine of substantive due process." Id.; see also Maldonado v. Fontanes, 568 F.3d 263, 273 (1st Cir. 2009). In particular, the Court has made it clear that state officials' negligence, without more, is simply insufficient to meet the conscience-shocking standard. See Lewis, 523 U.S. at 848-49.

We assume arguendo that DCYF created a "special relationship" because it affirmatively took responsibility for protecting the twins from harm while they remained in foster care.

_____

[3] This case does not involve the state-created danger theory, which this circuit has never, in any event, found applicable. See Véléz-Diaz v. Vega-Irizarry, 421 F.3d 71, 80 (1st Cir. 2005).

-11-

Even so, plaintiffs, on all of their evidence, did not make out a substantive due process claim. The evidence they put forward alleges troubling lapses in DCYF's supervision of the twins' foster care environment. But it does not allege any behavior by defendants that would meet the legal definition of conscience-shocking conduct.

Plaintiffs argue that the legal standard for defining conduct that "shocks the conscience" is whether the state has acted with "deliberate indifference." That is not entirely correct. As we stated in Rivera, deliberately indifferent behavior does not per se shock the conscience. Indeed, we suggested that it is only "[i]n situations where actors have an opportunity to reflect and make reasoned and rational decisions" that "deliberately indifferent behavior may suffice to shock the conscience." 402 F.3d at 36.[4] The burden to show state conduct that "shocks the conscience" is extremely high, requiring "stunning" evidence of "arbitrariness and caprice" that extends beyond "[m]ere violations of state law, even violations resulting from bad faith" to "something more egregious and more extreme." DePoutot v. Raffaelly, 424 F.3d 112, 119 (1st Cir. 2005). Gloria and Terry do

_____

[4] This circuit has never found on the facts of a case that deliberately indifferent behavior was sufficiently conscience-shocking to violate a plaintiff's substantive due process rights. Rivera merely suggested that under certain circumstances, deliberately indifferent behavior could conceivably qualify. 402 F.3d at 36; see also Ramos-Pinero v. Puerto Rico, 453 F.3d 48, 53 (1st Cir. 2006).

not defend their actions on the basis that they were responding to an emergency, with no time to reflect, but on the basis that even if their conduct fell short of regulatory requirements, it did not come close to shocking the conscience.

Plaintiffs' evidence did not show the defendants acted even with deliberate indifference. Though other circuits have varied in their formulations of when "deliberate indifference" rises to conscience-shocking conduct in the foster care context, state officials must have been at least aware of known or likely injuries or abuse and have chosen to ignore the danger to the child. See Nicini v. Morra, 212 F.3d 798, 810 (3d Cir. 2000) (listing cases); see also Waubanascum v. Shawano County, 416 F.3d 658, 666-67 (7th Cir. 2005) (holding that plaintiffs must present evidence that "the state actor knows or suspects that the . . . foster parents with whom a child is placed are likely to abuse the child" to show deliberate indifference).

Even when the evidence is viewed in the light most favorable to plaintiffs, no rational trier of fact could conclude that the defendants were aware that the twins were in danger of being abused or otherwise harmed by Stevens. Even if Gloria and Terry knew that Stevens and Lovick were living in and caring for the twins in the Sykes home, Gloria and Terry had no reason on that basis to identify them as a risk to the children. Plaintiffs have never asserted that Lovick was responsible for any of the harms

they claim. Previous reported incidents were investigated by DCYF and deemed not credible. Further, the reports contained no indication that Stevens was in any way involved.

Plaintiffs also argue that the various reported incidents should be viewed in the aggregate as general warning signs of abuse in the home. But these reports were all deemed unfounded until the May 1998 incident that resulted in the twins' removal. Moreover, Gloria's uncontested testimony indicated that DCYF social workers were not ordinarily given much information about unfounded CANTS reports. And there were no reports of suspected abuse, no indications of any injuries, and no reported behavioral problems between September 1997 and May 1998, which undercuts plaintiffs' theory of escalating warning signs.

Furthermore, there is no evidence that defendants made a reasoned decision to deliberately ignore the risk of harm to the twins in the course of supervising the twins' foster care placement. The defendants' failure to conduct background checks on Stevens and Lovick and to report their residency at the Sykes home were, at worst, possible violations of state law.[5] That failure

---

[5] Because we are reviewing a Rule 50(a) motion, we accept plaintiffs' version of the facts surrounding the background checks. However, we note, as the district court observed, that defendants vigorously contested plaintiffs' claim that DCYF never conducted a state background check on Stevens. DCYF officials testified that they did conduct a background check on Stevens through the Rhode Island Attorney General's Office, that no red flags appeared in it, and that this information was verbally conveyed to DCYF. See J.R., 599 F. Supp. 2d at 197 n.20.

does not amount to inherently egregious conduct. Plaintiffs' contention that the twins would not have been abused if DCYF had rescinded the Sykes's foster home license or removed them from the Sykes home at an earlier stage is an argument about "but for" causation, but not about the defendants' intentions or actions.

The defendants are entitled to qualified immunity. The supervisory liability claim against Terry necessarily fails as well. See Rivera, 402 F.3d at 38-39.

B.        State Law Claims

Plaintiffs also brought negligence claims under Rhode Island tort law against Gloria and Terry in their official capacities and against Gloria in her individual capacity. We hold, as did the district court, that all of these claims are barred by Rhode Island state law immunity doctrines.

Under Rhode Island law, state sovereign immunity is waived and state entities and their official representatives can be sued for torts only if (1) the state entity has a "special duty" to the plaintiffs, (2) the state entity has engaged in an "egregious" alleged act or omission, or (3) the state entity was engaging in the kind of actions that private parties normally perform. See Kuzniar v. Keach, 709 A.2d 1050, 1053 (R.I. 1998); see also R. I. Gen. Laws § 9-31-1. We reject plaintiffs' argument on appeal that the "special duty" exception applied and allowed suit against Gloria and Terry in their official capacities.

-15-

The "special duty" exception applies only if (1) state officials were aware of plaintiffs or their situation, (2) the officials "acted or failed to act in some way that was potentially injurious" to plaintiffs, and (3) it was "reasonably foreseeable" that plaintiffs' injuries would result from these acts or omissions. Morales v. Town of Johnston, 895 A.2d 721, 731 (R.I. 2006).

Plaintiffs argue that the district court should have found this "special duty" exception applicable given the court's conclusions in its substantive due process analysis that defendants had a "special relationship" with plaintiffs and that plaintiffs' evidence might suffice to show negligence.

This argument ignores the district court's finding that there was no evidence presented to show that defendants had any "actual knowledge of a substantial risk of harm." Nor did plaintiffs present evidence showing that defendants could have reasonably foreseen that either Stevens or Lovick were likely to abuse the children. Plaintiffs' failure to present such evidence means that they cannot satisfy the third prong of this test. Gloria and Terry remain entitled to immunity for the negligence claims brought against them in their official capacities. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 99-100, 106 (1984) (holding that barring waiver by the state, the Eleventh

Amendment precludes federal courts from hearing state claims brought against state officials in their official capacities).

Finally, as the district court held, Gloria is entitled to qualified immunity against the state law negligence claims made against her individually. Rhode Island law allows state officials like Gloria to invoke qualified immunity against state law negligence claims. See Hatch v. Town of Middletown, 311 F.3d 83, 90 (1st Cir. 2002). Plaintiffs seem to suggest to the contrary, but their argument conflates Rhode Island's waiver of state sovereign immunity under R.I. Gen. Laws § 9-31-1 in suits against state officials in their official capacities with defendants' entitlement to qualified immunity for suits brought against them in their individual capacities. Any challenge to the merits of the district court's qualified immunity ruling is waived.

Plaintiffs have made serious allegations about shortcomings in DCYF's monitoring of the twins' foster care placement in the Sykes home. But their remedy is not in court.

We affirm the district court's grant of judgment as a matter of law to the defendants under Rule 50(a).

So ordered.