SUPREME JUDICIAL COURT 
 
 JAKLIN SUZETH GOTAY[1] & others[2] vs. JULIANN CREEN & others[3]

 
 Docket:
 SJC-13666
 
 
 Dates:
 December 4, 2024 - March 21, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, & Wolohojian, JJ.
 
 
 County:
 Worcester
 

 
 Keywords:
 Department of Children & Families. Social Worker. Due Process of Law, Substantive rights. Immunity from Suit. Civil Rights, Immunity of public official, Supervisory liability. Federal Civil Rights Act. Practice, Civil, Civil rights, Summary judgment. Proximate Cause.
 
 

       Civil action commenced in the Superior
Court Department on July 20, 2018.
      The case was heard by Valerie A. Yarashus,
J., on a motion for summary judgment.
      The Supreme Judicial Court on its own
initiative transferred the case from the Appeals Court.
      Katherine B. Dirks, Assistant Attorney
General (Deborah Frisch, Assistant Attorney General, also present) for the
defendants.
      David A. Russcol (Timothy P. Wickstrom,
Charles M. Giacoppe, & Deborah Gresco-Blackburn also present) for the
plaintiffs.
      Ann Balmelli O'Connor, Alexis Williams
Torrey, & Lauren E. Russell, for Committee for Public Counsel Services
& another, amici curiae, submitted a brief.
      Jean Strout, of California, &
Katherine E. Burdick, for Juvenile Law Center & others, amici curiae,
submitted a brief.
      GEORGES, J.  At issue are the substantive due process claims
of two minor sisters who suffered severe harm while in the custody of the
Department of Children and Families (department).  One night in August 2015, the older sister,
then twenty-two months old, reached from her crib and manipulated a thermostat
dial, causing the bedroom to overheat. 
Tragically this led to the child's permanent impairment and the death of
a third foster child, who is not involved in this action.
      A lawsuit was brought in the Superior
Court against several defendants, including four department employees.  Relevant to this appeal, the older sister's
adoptive parent and the younger sister's guardian ad litem asserted claims
under 42 U.S.C. § 1983 (§ 1983), alleging that the department
employees' failure to fulfill their duties caused the children's harm.  The employees moved for summary judgment,
arguing they were entitled to qualified immunity.  A Superior Court judge denied the motion, and
the employees appealed under the doctrine of present execution.[4]
      This court transferred the matter on its
own motion.  For the following reasons,
we conclude that the employees did not violate the children's substantive due
process rights, as their conduct was not the proximate cause of the harm suffered.  Accordingly, we reverse the Superior Court's
denial of summary judgment.[5]  
      Background.  1. 
Facts.  We recite the material,
undisputed facts from the summary judgment record in the light most favorable
to the nonmoving party -- in this case, the plaintiffs.  Hill-Junious v. UTP Realty, LLC, 492 Mass.
667, 668 (2023).  
      a. 
The foster parent application process. 
In August 2013, Kimberly Malpass applied for licensure as a foster
parent through the department.  Defendant
Juliann Creen, a department family resource worker who worked as the primary
department contact for prospective foster and preadoptive families, was
assigned to conduct a license study to assess Malpass's suitability to provide
foster care.  
      Malpass, a single mother of three, had a
prior history with the department, including two reports pursuant to G. L.
c. 119, § 51A (51A reports), alleging child neglect –- one from 2008
and another from 2012.  The 2008 report
was "screened in"[6] for further investigation, but the allegations
were ultimately deemed unsupported.  The
2012 report, conversely, was "screened out," after it was determined
that the allegations were retaliation by someone in conflict with Malpass.  
      After evaluating Malpass, Creen concluded
that she met the requirements for foster parent licensure and submitted a
waiver request to approve her application despite her prior department
history.  The waiver pertained to
Malpass's nondisqualifying departmental records that warranted review, such as
a screened-out 51A report.  In her
request, Creen referenced the 2008 51A report but omitted the 2012 51A
report.  Her supervisor, defendant
Roxanna Johnson-Cruz, agreed with the waiver request, which was ultimately
approved with conditions.  Among the
conditions of the approval, Creen was required to verify Malpass's prescribed
medications and that all utilities for Malpass's home were in an adult's name,
given allegations in the 2008 51A report that Malpass had taken out credit
cards in her children's names.  Following
the approval, however, Creen failed to do so. 
Malpass was subsequently granted a six-month probationary license in
March 2014.  
      b. 
Placement of the children.  Two
infants in the department's custody, Samara Gotay and Alessa Sepulveda, were
placed with Malpass in June 2014 and February 2015, respectively.  Samara was eight months old at the time of
placement, while Alessa was placed shortly after her birth.  Defendant Breanne Peterson served as the
ongoing clinical social worker for both children, under the supervision of
defendant Catherine Varian.  As the
assigned social worker, Peterson was responsible for overseeing the children's
welfare in the foster home and ensuring that their needs were met.  
      Alessa's placement was expressly
"contingent on" weekly home visits "coordinated between the
[ongoing] and family resource social workers" -- i.e., Peterson and Creen,
respectively.  Additionally, two other
children relevant to this incident, Robin and Dana,[7] were placed with Malpass
in September and November 2014, respectively. 
Robin was just over one year old at the time of placement, while Dana
was over three years old.  
      c. 
March 2015 51A report.  In March
2015, Dana's social worker filed a 51A report against Malpass, alleging neglect
by Malpass and her boyfriend, Anthony Mallett. 
According to Dana's mother, Mallett -- who had been charged with armed
robbery -- was living in the foster home and had struck Dana on the head. 
      The department's policy no. 2006-01
(family resource policy) states that a foster home must not include "any
household member, alternative caretaker or frequent visitor" who, in the
department's judgment, poses "a threat of abuse or neglect to children
placed in the home."  Additionally,
policy no. 86-014 (background records check policy) identifies categories of
criminal offender record information (CORI) that may presumptively or
discretionarily disqualify an individual from serving as a foster parent.  Notably, the policy mandates CORI checks for
all "frequent visitors" in licensed foster homes, which may result in
the foster parent's disqualification. 
The background records check policy defines a "frequent
visitor" as, in part, "[a]ny individual who does not live in but
spends substantial time in the home, regardless of the reason or purpose of their
visitation."  Per the policy,
"non-custodial parent(s); relatives; significant others; baby-sitters;
caregivers; and other individuals who perform a caregiving role for any child
in the home" qualify as "frequent visitors."  
      On March 5, 2015, eleven department
employees, including all four defendants, convened to discuss the 51A report's
allegations.  The group discussed
evidence of Mallett's presence in the foster home, including Malpass's
admission that she had posted Mallett's bail for his robbery charge and social
media posts suggesting a romantic relationship. 
Safety concerns were noted not only for Dana, but also for Malpass
herself, as Dana's biological mother had previously threatened her.  The group decided to "screen in"
the report and remove Dana from Malpass's home pending further
investigation.  However, the decision was
made to allow the other foster children to remain, as their social workers
raised no immediate safety concerns. 
Following the meeting, Creen did not investigate the frequency of
Mallett's visits to the Malpass home.  
      To assess the allegations in the March
2015 51A report, a department investigator interviewed Creen, Peterson,
Malpass, Mallett, Dana's mother, and Dana that same month.  Malpass stated that Mallett visited her home
"maybe [two to three] times a month" and had never been left home
alone with the foster children, and that she understood the requirement to
notify the department if a new individual moved in or visited "on a
frequent basis."  
      The investigator obtained Mallett's CORI
records, which revealed an open armed robbery charge, three assault and battery
charges, and multiple restraining orders. 
This information was included in the investigator's report, pursuant to
G. L. c. 115, § 51B (51B report), completed later that
month.  The investigator concluded that
the allegations made in the March 2015 51A report were unsupported, but noted
that Mallett was present in Malpass's home "more often than was
reported."  Though the investigator
did not opine in his report whether this made Mallett a "frequent
visitor" under department policy, he later testified in a deposition that
he believed Mallett to be a "frequent visitor."  
      Following the investigator's findings, the
responsibility fell on Creen, as the family resource worker, to ensure
Malpass's compliance with the family resource policy's frequent visitor
requirements and the background records check policy.  To that end, Creen and Johnson-Cruz, or another
social worker, planned to conduct weekly visits to Malpass's home, but these
visits never occurred.  Instead, after
the 51B report's release in March 2015, Creen visited Malpass's home only three
times over several months.  During each
visit, including the final visit on August 12, 2015, Creen noted neither
Mallett's presence nor any other concerns. 
Creen also had one conversation with Malpass in which she instructed
that Mallett was not permitted in the foster home.
      Beyond these three visits and the single
instruction to Malpass, no defendant appears to have followed up on Mallett's
continued presence around the children. 
On this point, the department later concluded that "there was no
increased oversight of the [Malpass] home" following the investigation and
51B report.  
      d.  August
2015 incident.  Two days after Creen's
final visit, on the evening of August 14, 2015, Malpass left her home to meet
friends, leaving Mallett responsible for the foster children.  After feeding them, Mallett put Alessa,
Samara, and Robin to bed.  Alessa slept
in Malpass's bedroom, which had an air conditioning unit, while Samara and
Robin slept in the children's room, which did not.  
      Later that night, Malpass returned home
intoxicated and vomiting.  Frustrated at
having been left to care for multiple children while Malpass socialized,
Mallett took two Xanax tablets and went to bed. 
At one point, he awoke to the sound of the children crying, but fell
back asleep without checking on them. 
The following morning, he awoke to Malpass screaming after she
discovered Samara and Robin unresponsive. 

      An investigation later determined that
during the night, Samara had adjusted the thermostat on an electric heater,
which was on the wall above the crib, causing the children's room to overheat.[8]  As a result, Robin died and Samara suffered
severe injuries.  After Malpass called
911, the children were transported to UMass Memorial Medical Center, where
Robin was pronounced dead.  Samara was
found to be in critical condition, suffering from respiratory failure,
seizures, hyperthermia (a high temperature), and hypotension (low blood
pressure).  
      In December 2021, Samara was legally
adopted by plaintiff Jaklin Suzeth Gotay, and her care and protection
proceeding in the Juvenile Court was closed. 
She continues to suffer from injuries that impair her mobility and
verbal communication.  In March 2022,
Alessa began living with her father, plaintiff Juan Sepulveda, though the
department retains her legal custody. 
Although Alessa was not sleeping in the overheated room and was
therefore not physically harmed, due to her separation from her older sister,
she experiences mood swings, sleep disturbances, eating difficulties, and
behavioral challenges at school, and requires counseling due to her separation
from Samara.  
      During an investigation by the department
of the August 2015 incident, Mallett admitted that he had lived in the foster
home for approximately eighteen months and had previously lied about his
residency during the March 2015 51A investigation.  He further disclosed that Malpass instructed
her children to conceal his presence and that he regularly assisted in caring
for all the children, including the foster children.  Following the investigation, the department
revoked Malpass's foster parent license. 
She was later indicted on several criminal charges, including two counts
of reckless endangerment of a child.  
      2. 
Procedural history.  Alessa and
Samara's guardian ad litem, along with their biological parents, commenced an
action in the Superior Court against Malpass, the department, its commissioner,
and four department employees.  Although
the guardian ad litem initially sued on behalf of both children, the complaint
was later amended to substitute Samara's adoptive mother as her
representative.  
      Relevant to this interlocutory appeal, the
plaintiffs asserted § 1983 claims against the department employees,
alleging violations of Alessa and Samara's substantive due process rights.  After an unsuccessful motion to dismiss, the
department employees answered the complaint and moved for judgment on the
pleadings, citing qualified immunity. 
The motion was denied as premature. 

      Subsequently, the department employees
filed a motion for summary judgment, Mass. R. Civ. P. 56 (b), 365 Mass.
824 (1974), again asserting qualified immunity. 
After a hearing, a Superior Court judge denied the motion.  In doing so, the motion judge reviewed
Federal case law and assumed, without deciding, that Samara and Alessa had a
clearly established substantive due process right to a safe foster home.  See, e.g., Connor B. ex rel. Vigurs v.
Patrick, 774 F.3d 45, 53 (1st Cir. 2014) (assuming without deciding that
"special relationship" between foster child and State entails duty to
provide safe living environment).  
      The motion judge acknowledged ambiguity
regarding the applicable legal standard in the foster care context:  whether the "professional judgment"
standard from Youngberg v. Romero, 457 U.S. 307, 323 (1982), or the
"deliberate indifference" standard from County of Sacramento v.
Lewis, 523 U.S. 833, 846, 851-852 (1998), should apply.  Nonetheless, the judge concluded that, when
viewed in the light most favorable to the plaintiffs, the summary judgment
record demonstrated that the department employees' conduct met both standards,
thereby defeating their qualified immunity defense under § 1983.  
      The department employees appealed from the
denial of summary judgment.  On appeal,
we transferred the case to this court on our own motion to determine whether
they are entitled to qualified immunity with respect to the plaintiffs'
§ 1983 claims.  
      Discussion.  1. 
Standard of review.  Our review of
a summary judgment decision is de novo. 
Metcalf v. BSC Group, Inc., 492 Mass. 676, 680 (2023).  "Summary judgment is appropriate where
there is no material issue of fact in dispute and the moving party is entitled
to judgment as a matter of law" (citation omitted).  Adams v. Schneider Elec. USA, 492 Mass. 271,
280 (2023).  
      2. 
Qualified immunity.  Government
officials are entitled to qualified immunity from § 1983 claims for
damages if "their conduct does not violate clearly established statutory
or constitutional rights of which a reasonable person would have known"
(citation omitted).  Littles v.
Commissioner of Correction, 444 Mass. 871, 875 (2005).  The determination of qualified immunity
follows a two-part test:  
"The first
prong asks whether the facts alleged or shown by the plaintiff make out a
violation of a constitutional right; the second prong asks whether that right
was clearly established at the time of the defendant's alleged violation.  [T]he second step, in turn, has two
aspects.  One aspect of the analysis
focuses on the clarity of the law . . . .  The other aspect focuses more concretely on
the facts of the particular case and whether a reasonable defendant would have
understood that his conduct violated the plaintiffs' constitutional
rights" (quotations and citation omitted).

Penate v.
Sullivan, 73 F.4th 10, 17–18 (1st Cir. 2023). 

      Under the first prong, "'substantive
due process' prevents the government from engaging in conduct that 'shocks the
conscience'" (citation omitted). 
United States v. Salerno, 481 U.S. 739, 746 (1987).  In the foster care context, courts apply one
of two standards to determine whether government conduct is
conscience-shocking.  The first,
articulated in Lewis, 523 U.S. at 851-852, is the "deliberate
indifference" standard.  See, e.g.,
Doe v. New York City Dep't of Social Servs., 649 F.2d 134, 141-147 (2d Cir.
1981) (applying deliberate indifference standard to agency supervision of
foster home).  Under this standard, a
plaintiff must show that a government actor "exhibited deliberate
indifference to a known injury, a known risk, or a specific duty."  Id. at 145. 

      Alternatively, under the second standard,
outlined in Youngberg, 457 U.S. at 323, a plaintiff must show that a State
actor's professional decision constitutes such a "substantial departure
from accepted professional judgment, practice, or standards" that the
decision was not actually based on such judgment.  See, e.g., Yvonne L. v. New Mexico Dep't of
Human Servs., 959 F.2d 883, 894 (10th Cir. 1992) (applying "professional
judgment" standard in foster care context).    
      Under either standard, mere negligence is
insufficient.  See, e.g., Hopper v.
Callahan, 408 Mass. 621, 627 (1990) (Youngberg formulation requires more than
ordinary negligence); Schwartz v. Booker, 702 F.3d 573, 585–586 (10th Cir.
2012) (failure to exercise professional judgment "requires more than mere
negligence"); J.R. v. Gloria, 593 F.3d 73, 80 (1st Cir. 2010) (noting that
negligence alone does not satisfy Lewis standard).  
      Since negligence alone is insufficient,
and despite potential variations between the two standards, courts have
emphasized the stringent requirements of both. 
For example, the United States Court of Appeals for the First Circuit
has observed that "deliberately indifferent behavior does not per se shock
the conscience."  J.R., 593 F.3d at
80.  Rather, under the Lewis test,
"[t]he
burden to show that [deliberately indifferent behavior] 'shocks the conscience'
is extremely high, requiring 'stunning' evidence of 'arbitrariness and caprice'
that extends beyond '[m]ere violations of state law, even violations resulting
from bad faith' to 'something more egregious and more extreme.'"  
Id., quoting
DePoutot v. Raffaelly, 424 F.3d 112, 119 (1st Cir. 2005).[9]  Under Youngberg, a mere departure from
accepted professional judgment is insufficient; instead, "the official
must have abdicated her professional duty sufficient to shock the
conscience."  Schwartz, 702 F.3d at
585-586.  Conduct reaches this threshold
"when the degree of outrageousness and . . . magnitude of potential
or actual harm . . . is truly conscience shocking" (quotation
and citation omitted).  Id. at 586.  
      Importantly, whether applying the
"deliberate indifference" or the "professional judgment"
standard, a plaintiff must establish that the constitutional violation caused
the plaintiff's injury.  See Yvonne L.,
959 F.2d at 890 (holding under "professional judgment" standard that
"an affirmative link" must exist between defendants' failure to
exercise professional judgment and plaintiff's injuries); Doe, 649 F.2d at 145
(holding under "deliberate indifference" standard that defendants'
"failure to perform the duty or act to ameliorate the risk or injury [must
be] a proximate cause of plaintiff's deprivation of rights under the Constitution").  See Springer v. Seaman, 821 F.2d 871, 877-880
(1st Cir. 1987) (applying traditional tort rules concerning proximate causation
to § 1983 claims).  See also Malley
v. Briggs, 475 U.S. 335, 344 n.7 (1986) (§ 1983 "should be read
against the background of tort liability that makes a man responsible for the
natural consequences of his actions" [citation omitted]).
      3. 
Right to reasonably safe placement. 
The United States Supreme Court has recognized that when a State
"takes a person into its custody and holds him there against his will, the
Constitution imposes upon it a corresponding duty to assume some responsibility
for his safety and general well-being." 
DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189,
199–200 (1989), citing Youngberg, 457 U.S. at 317.  Courts interpreting DeShaney have held that
"when the state places a child in state-regulated foster care, the state
has entered into a special relationship with that child which imposes upon it
certain affirmative duties," and that failing to perform such duties
"under sufficiently culpable circumstances" may give rise to
liability under § 1983.  Nicini v.
Morra, 212 F.3d 798, 807, 808 (3d Cir. 2000) ("foster children have a substantive
due process right to be free from harm at the hands of state-regulated foster
parents").  Indeed, the Court in
DeShaney expressly noted that if a State "remove[s] [a child] from free
society and place[s] him in a foster home operated by its agents, we might have
a situation sufficient[] . . . to give rise to an affirmative duty to
protect."  DeShaney, supra at 201
n.9.  
      We recognize that such circumstances are
sufficient to establish a special relationship and hold, as other jurisdictions
have, that "[o]nce the state assumes wardship of a child, the state owes
the child, as part of that person's protected liberty interest, reasonable
safety and minimally adequate care and treatment appropriate to the age and
circumstances of the child" (citation omitted).  Tamas v. Department of Social & Health
Servs., 630 F.3d 833, 846-847 (9th Cir. 2010) (collecting cases of other
jurisdictions discussing this principle). 
Under G. L. c. 119, § 23, the department assumes
responsibility, including financial responsibility, for providing foster
care.  This duty persists even after
placement, as foster parents derive their rights and status from the
department.  Adoption of a Minor, 386
Mass. 741, 747 (1982).  A minor in the
foster care system cannot leave voluntarily until he or she reaches adulthood
or until the department deems the child's commitment or court order
fulfilled.  G. L. c. 119,
§ 26.  Further, the department
retains authority over key aspects of a foster child's life, including the
child's "place of abode, medical care and education."  G. L. c. 119, § 21.  The court may also order that certain
conditions or limitations concerning the "care and custody of the
child" be fulfilled.  G. L.
c. 119, § 26 (b).  Given
the nature of the State's custody of children, we conclude that a "special
relationship" exists between foster children and the State, imposing upon
the State an affirmative duty to ensure a reasonably safe foster home
environment.
      4. 
Application.  Having recognized a
right to a reasonably safe foster home, we now assess whether the plaintiffs
have demonstrated a substantive due process violation of that right.  The department employees argue that the
"deliberate indifference" standard set forth in Lewis, 523 U.S. at
851-852, governs in the foster care context.[10]  The plaintiffs, however, reject this
approach, contending the Youngberg "professional judgment" standard
should apply.  We need not resolve any
tension between these standards or determine which is more appropriate here;
under either framework, the department employees' conduct did not proximately
cause the children's harms.  
      Turning to the conduct of the defendants,
we recognize that § 1983 claims require an individualized assessment of
each defendant's conduct.  Hubbard v.
Oklahoma ex rel. Okla. Dep't of Human Servs., 759 Fed. Appx. 693, 706 (10th
Cir. 2018) (noting that § 1983 claims "must stand or fall based on
the conduct of each defendant individually").  Having individually assessed each defendant,
we nonetheless group Creen and Peterson together in our analysis given the
substantial overlap in their omissions. 
Specifically, both Creen and Peterson, individually, failed to (1)
conduct more frequent home visits after the March 2015 51A report, (2) further
investigate Mallett's presence in the Malpass home given his criminal record,
and (3) recommend the children's removal in light of the Mallett allegations
and the risk posed due to his criminal history. 
Additionally, Creen neither disclosed the screened-out 2012 51A report
in her waiver request nor verified Malpass's medications and utilities during
the licensing process.  
      We first evaluate Creen and Peterson's
omissions under the "deliberate indifference" test, i.e. whether they
"exhibited deliberate indifference to a known injury, a known risk, or a
specific duty."  Doe, 649 F.2d at
145.  The principal risk at issue was
Mallett's presence in the home given his criminal history.  Even assuming both Creen and Peterson
recognized or should have recognized the risk Mallett posed to the children,
their "failure to . . . act to ameliorate the risk" was not
the proximate cause of the children's harm. 
Id.  See Leavitt v. Brockton
Hosp., Inc., 454 Mass. 37, 45 (2009) ("Liability for conduct obtains only
[both] where the conduct is . . . a cause in fact of the injury and
where the resulting injury is within the scope of the foreseeable risk
. . ."); Vázquez-Filippetti v. Banco Popular de Puerto Rico, 504
F.3d 43, 49 n.6 (1st Cir. 2007) ("A defendant's actions may only be the
proximate cause of a plaintiff's injuries if they in fact caused the injuries
and the defendant could have reasonably foreseen that the injuries [or related
harms] would result from his actions"). 

      Put differently, Creen and Peterson could
not have reasonably foreseen that their omissions would lead to the children's
injuries.  The risk posed by the crib's
placement near the thermostat fell outside the scope of the risk associated
with Mallett's presence.[11]  Thus, the
claims against Creen and Peterson fail.  
      The "professional judgment" standard
articulated in Youngberg similarly provides no basis for relief.  Under that standard, the defendants'
decisions must constitute "such a substantial departure from accepted
professional judgment, practice, or standards as to demonstrate that the person
responsible actually did not base the decision on such a judgment."  Youngberg, 457 U.S. at 323.  Here, the record includes an expert affidavit
asserting that Creen and Peterson failed to comply with "established
policies, standards, regulations and best case practices."[12]  Even if these alleged failures amounted to an
abdication of their professional duties, there is no "affirmative
link" between those failures and the children's injuries.  Yvonne L., 959 F.2d at 890.  None of the policies, standards, regulations,
or best practices cited by the expert and the plaintiffs pertains to the danger
posed by the thermostat.  While greater
adherence to professional practices, such as more frequent home visits, might
have led to (i) the discovery of Mallett's presence, (ii) the revocation of
Malpass's license, and (iii) the incidental prevention of the children's harm,
the harm suffered by the children fell outside the scope of the reasonably
foreseeable risk.  See Vázquez-Filippetti,
504 F.3d at 49 n.6 (defendant's actions constitute proximate cause when harm is
reasonably foreseeable).
      In sum, whether Creen and Peterson were
deliberately indifferent to the risk posed by Mallett, or whether their
failures to conduct more frequent home visits, investigate Mallett's presence,
or recommend the children's removal constituted a departure from professional
standards or practice, the risk here was not reasonably foreseeable.  That is likewise true even if Creen departed
from professional standards by failing to disclose the screened-out 2012 51A
report in her waiver request or by failing to verify Malpass's medications and
utilities.  Accordingly, the defendants'
conduct does not satisfy the proximate causation requirements for
liability.  
      We next consider the conduct of the
supervisory defendants, Johnson-Cruz and Varian.  A supervisor may be held liable under
§ 1983 for a subordinate's conduct only if that conduct resulted in a
constitutional violation and the supervisor's actions or omissions were
affirmatively linked to it, whether through "encouragement, condonation or
acquiescence or gross negligence amounting to deliberate indifference"
(citation omitted).  Saldivar v. Racine,
818 F.3d 14, 18 (1st Cir. 2016).  
      Here, because we have already determined
that Creen and Peterson's actions did not constitute a constitutional
violation, Johnson-Cruz and Varian cannot be held liable as their supervisors,
even assuming an affirmative link could be established.  Moreover, to the extent the plaintiffs allege
that Johnson-Cruz and Varian personally violated the children's constitutional
rights independently of their subordinates' conduct, the record lacks
sufficient evidence to support such claims. 
For instance, beyond Varian's attendance at the March 2015 meeting, the
record offers little else, even when viewed in the light most favorable to the
plaintiffs.  See Hubbard, 759 Fed. Appx.
at 713 (holding that mere attendance at meeting regarding foster children,
without allegations of responsibility for broader harmful policy, was
insufficient to state substantive due process claim under § 1983).  
      Conclusion.  The department employees' conduct does not
rise to the level of a substantive due process violation.  Accordingly, they are entitled to qualified immunity.  We therefore reverse the Superior Court's
order denying summary judgment in their favor.[13]
So ordered.

footnotes

[1] As parent and
next friend of Samara Kristine Gotay, formerly known as Samara Sepulveda.

[2] Matthew P.
Moran, as guardian ad litem of Alessa Sepulveda; Kerri Flanagan Sepulveda; and
Juan Sepulveda.  

[3] Roxanna
Johnson-Cruz, Breanne Peterson, and Catherine Varian.

[4] Although a
denial of a motion for summary judgment is interlocutory and not appealable as
of right, the doctrine of present execution applies here because "the
question of immunity is collateral to the merits of the case and because
immunity from suit entitles a party to avoid not only liability but also the
burden of the litigation."  Maxwell
v. AIG Dom. Claims, Inc., 460 Mass. 91, 98 (2011).  

[5] We
acknowledge the amicus briefs submitted by the Committee for Public Counsel
Services and the Children's Law Center of Massachusetts in support of neither
party; and the Juvenile Law Center, the National Center for Youth Law, and
Children's Rights in support of the plaintiffs. 

[6] The
department "screens" 51A reports -- i.e., gathers information -- to
identify children at risk of abuse or neglect by a caregiver."  110 Code Mass. Regs. § 4.21 (2023).  If a report does not meet the criteria for
suspected abuse or neglect and no response is required, it is "screened
out."  110 Code Mass. Regs.
§ 4.24(3) (2023).  Conversely, if a
report is "screened in," it proceeds to further investigation
pursuant to G. L. c. 119, § 51B. 
110 Code Mass. Regs. § 4.21. 

[7] We refer to
these two children by pseudonyms.

[8] Forensic
scientists from the State police collected a swab from the thermostat.  A State police crime analyst examined the
sample and concluded that Samara's deoxyribonucleic acid profile "is
consistent with the major profile from the [thermostat] swab."  Additionally, a State police heat study
determined that the temperature in Samara and Robin's bedroom was eighty-eight
degrees Fahrenheit at 8:01 P.M. on the night of the incident, rising to 109
degrees Fahrenheit by midnight.

[9] The decision
in J.R. illustrates how courts have stringently applied the "deliberate
indifference" standard.  In J.R.,
593 F.3d at 76, 79, the mother of twin boys in foster care brought a
substantive due process claim against a social worker and her supervisor,
alleging deliberate indifference to the risk of sexual abuse.  She contended that the defendants failed to
report two men living in the foster home, conduct background checks, or
maintain regular contact with the children. 

      The First Circuit affirmed the lower
court's grant of judgment as a matter of law, holding that the plaintiffs
failed to establish a substantive due process violation because the evidence
did not demonstrate deliberate indifference rising to the level of
conscience-shocking conduct.  Id. at
80.  The court reasoned that no rational
fact finder could conclude the defendants were aware of an actual risk to the
twins, particularly given that prior abuse allegations had been investigated
and deemed not credible.  Id. at
80-81.  Moreover, while some omissions,
such as the failure to conduct background checks, may have violated State law,
the court emphasized that such failures did not constitute "inherently
egregious conduct."  Id. at 81.

[10]
Additionally, the department employees argue that because Alessa was not
physically harmed in the August 2015 incident, she did not suffer a cognizable
deprivation of life, liberty, or property by a State actor.  However, a foster child's substantive due
process rights may be violated when the State's failure to ensure safety in its
custody causes significant harm to the child's mental well-being.  See K.H. v. Morgan, 914 F.2d 846, 848 (7th
Cir. 1990) ("The extension to the case in which the [foster child's]
mental health is seriously impaired by deliberate and unjustified state action
is straightforward").

[11] Compare
Aguirre v. Adams, 15 Kan. App. 2d 470, 473-475 (1991) (holding landlord's
failure to supply hot water to bathroom was not proximate cause of child's
burns, where mother brought hot water from kitchen sink to bathtub and child
fell into tub after being left unsupervised in bathroom), with McKeon v.
Goldstein, 53 Del. 24, 25-26, 28–29 (1960) (leaving for trier of fact whether
landlord proximately caused infant's burn after mother had placed infant in bed
located near heating system steam pipe, given that landlord knew about
dangerous condition, which landlord promised to remove, and was aware of
child's presence). 

[12] The summary
judgment record includes an expert affidavit from Paula Wisnewski, a licensed
independent clinical social worker, who asserts that department employees acted
recklessly and were "deliberately indifferent to following their own
policies" in approving Malpass and her home for foster children.  Citing multiple policy and regulatory
violations, Wisnewski contends that Creen's failure to address "[p]ast
51A/B activity" in the family resource assessment violated 110 Code Mass.
Regs. § 7.103(3)(i) (2009).  She
further avers that department employees, in reckless disregard, failed to
adhere to department regulations, policies, and best practices in handling
Mallett, who "showed a significant potential danger to the home
. . . that should have not been ignored."  For example, citing 110 Code Mass. Regs.
§ 18.08(2)(d) (2008), Wisnewski opines that, following the March 2015 51B
report, department employees were required to rerun Mallett's CORI and conduct
a background record check on him. 

[13] Accordingly,
the plaintiffs' request for costs and attorney's fees under 42 U.S.C.
§ 1988 is denied.  See LaChance v.
Commissioner of Correction, 475 Mass. 757, 763 (2016) (holding that party must
prevail to be eligible for fee award under § 1988).